UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

DAQUAN JACKSON

Plaintiff,

-against-

CITY OF NEW YORK, DETECTIVE NIURCA
QUINONES SHIELD #3310, SERGEANT STEVEN
SMOLARSKY AND JOHN DOE POLICE OFFICER #1,

Defendants.

---------------------------------------------------------------------- x

FIRST AMENDED
COMPLAINT AND
JURY DEMAND

**15CV7135 (ERK)(SMG)**

## PRELIMINARY STATEMENT

1. This is a civil rights action in which plaintiff seeks relief through 42 U.S.C. §1983

for the violation of his Fourth and Fourteenth Amendment rights in addition to violations

of the laws and Constitution of the State of New York.

2. The claim arises from a September 24, 2014 incident in which Officers of the New

York City Police Department ("NYPD"), acting under color of state law, intentionally

and willfully denied plaintiff due process and subjected plaintiff to, among other things,

assault, false arrest, false imprisonment, and malicious prosecution.

3. Plaintiff seeks monetary damages (special, compensatory, and punitive) against

defendants, as well as an award of costs and attorneys' fees, and such other and further

relief as the Court deems just and proper.

## JURISDICTION

4. This action arises under the Fourth and Fourteenth Amendments to the United

States Constitution and under 42 U.S.C. §1983 and §1988 and the laws and Constitution

of the State of New York.

5. The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

VENUE

6. Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

PARTIES

7. Plaintiff resided at all times here relevant in Kings County, City and State of New York.

8. The City of New York ("City") is a municipal corporation organized under the laws of the State of New York. At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

9. Defendant police officers were, at all times here relevant, police officers of the NYPD, and as such were acting in the capacity of agents, servants and employees of the City of New York.

10. On information and belief, at all times relevant hereto, defendant officers were involved in the decision to arrest plaintiff without probable cause or failed to intervene in

the actions of their fellow officers when they observed them arresting plaintiff without probable cause.

11. On information and belief the defendant officers were involved in denying plaintiff due process or failed to intervene in the actions of their fellow officers when they observed them denying plaintiff due process.

12. On information and belief, at all times relevant hereto, defendant officers were under the command of the Brooklyn Special Victims Squad and are sued in their individual capacity.

13. At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## NOTICE OF CLAIM

14. Within 90 days of the events giving rise to these claims, plaintiff filed written notices of claim with the New York City Office of the Comptroller. Over 30 days have elapsed since the filing of those notices, and this matter has not been settled or otherwise disposed of.

## FACTUAL ALLEGATIONS

15. Plaintiff is 22 year old Brooklyn resident with no criminal record. At the time of the incident, he was a member of Local 8 and employed full time as a roofer.

16. On August 31, 2014, at approximately 6:15AM a woman ("Jane Doe") claimed to have been raped twice in the vicinity of 50 Irving Pl, Brooklyn, NY. Jane Doe allegedly reported that she was sexually assaulted by one male and then, when she fled that attacker, raped by another male who she stopped to ask for help.

17.    On September 24, 2014, plaintiff was sleeping on the couch in his home when police knocked on the door.  The officers told plaintiff's mother that they were looking for "Daniel Logan".   Plaintiff's mother told the officers that she does not know a "Daniel Logan" and there was no one by that name in her home.  The officers demanded she let them in anyway.

18.    Plaintiff told the officers his name when they entered his home.  Without probable cause, the officers arrested plaintiff and placed him in a police van.

19.    Once at the precinct, plaintiff was interrogated by defendant Officer Quinones. Quinones and another officer berated, threatened and frightened plaintiff.  Plaintiff was crying and shaking but the officers continued their relentless interrogation which included one detective claiming she didn't think Mr. Jackson committed the crime; if he would just explain that he saw the victim at the time of the incident she would make sure he was released.  Eventually plaintiff made a written statement, not a confession, which was inaccurate and molded by the demands and threats of Officer Quinones.

20.    Jane Doe failed to identify plaintiff as her alleged attacker during a police arranged identification procedure.   The defendant officers conducted additional identification procedures that were suggestive and other witness statements were coerced.

21.    A surveillance video in the possession of the defendant officers of the alleged attacker walking down the street near the time of the incident bears no resemblance to plaintiff.

22.    Despite the lack of identification by Jane Doe, the questionable veracity of Jane Doe's account, the coerced statement, and the striking differences between plaintiff and the male depicted in the video, the defendant officers caused plaintiff to be prosecuted.

Plaintiff was arraigned on a false charge and bail was set.  Plaintiff was sent to Rikers Island.

23.   The media, including the NY Daily News, published an article with plaintiff's name, a photograph of plaintiff and the charges filed against him causing incredible stress, embarrassment, shame and fear for plaintiff and his family.

24.   From the moment he was brought to the precinct, plaintiff repeatedly requested and agreed to take part in DNA testing.  Five days after his arrest, DNA test results exonerated plaintiff of the crime and he was released from jail.  All charges were dismissed and sealed on March 27, 2015, six months after his arrest.

25.   At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiff's rights. The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They failed to intervene in the obviously illegal actions of their fellow officers against plaintiff.

26.   During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

## DAMAGES

27.   As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

     a.   Violation of his rights pursuant to the Fourth Amendment of the United States Constitution to be free from an unreasonable search and seizure of their persons;

b.      Violation of his rights pursuant to the Fourteenth Amendment of the

United States Constitution to due process;

c.      Violation of his New York State Constitutional rights under Article 1,

Section 12 to be free from an unreasonable search and seizure;

d.      Violation of his New York State Constitutional rights under Article 1,

Section 6 to due process;

e.      Physical pain and suffering;

f.      Emotional trauma and suffering, including fear, embarrassment,

humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

g.      Loss of liberty.

### FIRST CAUSE OF ACTION
42 U.S.C. § 1983
False Arrest/Malicious Prosecution

28.   The above paragraphs are here incorporated by reference.

29.   Defendants acted under color of law and conspired to deprive plaintiff of his

civil, constitutional and statutory rights to be free from unreasonable search and seizure,

and to due process of law pursuant to the Fourth and Fourteenth Amendments to the

United States Constitution and are liable to plaintiff under 42 U.S.C. §1983.

30.   Defendants arrested plaintiff without probable cause to believe he had

committed a crime and maliciously prosecuted him.

31.   Plaintiff has been damaged as a result of defendants' wrongful acts.

### SECOND CAUSE OF ACTION
42 U.S.C. §1983
Due Process

32.   The above paragraphs are here incorporated by reference.

33.   Defendants acted under color of law and conspired to deprive plaintiff of his

civil, constitutional and statutory rights to be free from unreasonable search and seizure, and to due process of law pursuant to the Fourth and Fourteenth Amendments to the United States Constitution and are liable to plaintiff under 42 U.S.C. §1983.

34. Among other acts described above, defendants conducted suggestive identification procedures and coerced both the witnesses and the plaintiff thereby denying plaintiff of due process.

35. Defendants created false and misleading information and forwarded that information to the prosecuting authority to deny plaintiff a fair trial.

36. Plaintiff was damaged as a result of the defendants' wrongful acts.

<u>THIRD CAUSE OF ACTION</u>
False Arrest/False Imprisonment/Malicious Prosecution

37. The above paragraphs are here incorporated by reference.

38. Defendants, despite knowing that probable cause did not exist to arrest, imprison and prosecute plaintiff, intentionally, recklessly and with malice caused plaintiff to be prosecuted for crimes he did not commit. The defendants intentionally withheld and misrepresented facts to the prosecuting authority including that the identifications were the product of unduly suggestive procedures, that the statements made by witnesses and the plaintiff were the result of coercion and threat and that the complaining witness failed to identify plaintiff. Defendants withheld exculpatory evidence and fabricated inculpatory evidence.

39. The criminal proceedings were terminated favorably to defendant.

40. As a direct and proximate result of the misconduct, false arrest and malicious prosecution detailed above, plaintiff sustained the damages described above.

## FOURTH CAUSE OF ACTION
Assault

41.   The above paragraphs are here incorporated by reference.

42.   Upon approaching plaintiff, arresting him, then placing him in a small room inside the precinct where he was threatened and berated for hours, defendants made plaintiff fear for his physical well-being and safety and placed him in apprehension of immediate harmful and offensive touching.

43.   Defendants, their officers, agents, servants and employees, were responsible for plaintiff's safety and well-being during this period of time. Defendant City, as employer of defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

44.   As a direct and proximate result of the misconduct and the abuse of authority detailed above, plaintiff sustained the damages described above.

## FIFTH CAUSE OF ACTION
Municipal Liability 42 U.S.C. §1983

45.   The above paragraphs are here incorporated by reference.

46.   The City is liable for the damages suffered by plaintiff because, after learning of its employees' violations of New Yorkers' constitutional rights, the City has:  failed to remedy the wrong; created a policy or custom under which unconstitutional practices regularly occur and even thrive; and has been grossly negligent in managing subordinates who cause the unlawful events.  The result of the City's inaction is a culture within the NYPD where the same officers, the same units, and the same precincts repeatedly and routinely engage in acts of misconduct.  By failing to properly train, supervise, and discipline its employees, agents, and servants, the City effectively encourages illegal, immoral, and unprofessional behavior.

47.    On numerous occasions over the span of many years, the City of New York has been alerted to the regular use of excessive force and the frequency of false arrests charges brought by its police officers.  Despite having acquired such knowledge, the City has refused to appropriately sanction its employees' illegal behavior.

48.    The City's deliberate indifference to civil rights violations committed by individual police officers, as well as patterns of misconduct committed by the same officers or occurring in the same precinct has caused the constitutional violations against Plaintiff in this case.

## THE CITY FAILS TO TRACK LAWSUITS, THEREBY SEVERING ANY POTENTIAL DETERRENT VALUE OF CIVIL RIGHTS ACTIONS

49.    The City has been aware for some time – from civil rights lawsuits, Notices of Claim, complaints filed with the Civilian Complaint Review Board ("CCRB"), City Council hearings, newspaper reports, criminal cases resulting in declined prosecutions and dismissals, and judicial rulings suppressing evidence and finding officers incredible as a matter of law – that a disturbing number of NYPD officers unlawfully search and seize citizens without probable cause, bring charges against citizens with no legal basis, perjure themselves in charging instruments and through testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.

50.    It is well documented that the number of claims against the NYPD has doubled in recent years and has cost taxpayers more than $1 billion.[1]  Despite these staggering

---

[1] *See* Barry Paddock, Rocco Parascandola, John Marzulli, & Dareh Gregorian, *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE (reporting that the number of claims against the NYPD doubled between 2004-2014, to a record high of 9,570 lawsuits filed in 2012, costing taxpayers nearly $1 billion); Colleen Long & Jennifer Peltz, Associated Press, *Nearly $1B in NYC police payouts*, Yahoo! News (October 14, 2010, 7:44 PM), http://news.yahoo.com/ap-investigation-nearly-1b-nyc-police-payouts.html (reporting that, in the decade ending in 2010, the City paid out nearly one billion dollars to resolve claims against the NYPD);

figures, the City has repeatedly resisted attempts to catalog even the most basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD.  Although certain police officers, units, and precincts have been found to have violated New Yorkers' constitutional rights *repeatedly*, the City refuses to track the data.[2]

*51.*    Courts – including this nation's highest court – assume that civil rights lawsuits deter police misconduct.  *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.") (citing *Carey v. Piphus,* 435 U.S. 247, 254-257 (1978)); *Hudson v. Michigan*, 547 U.S. 586, 598 (2006) ("As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts.") (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 70 (2001) and *Nix v. Williams,* 467 U.S. 431, 446, (1984)).

*52.*    However, because the City of New York refuses to track civil rights lawsuits, such suits do not serve the deterrent purpose envisioned by the Supreme Court.  By failing to keep track of this crucial data – which could save lives as well as taxpayer

---

Caroline Bankoff, *The City Has Paid Almost Half a Billion Dollars in NYPD-Related Settlements Over the Past 5 Years*, NYMag.com, Oct. 12, 2014, http://nymag.com/daily/intelligencer/2014/10/428-million-in-nypd-related-settlements-paid.html (reporting that, between 2009-2014, New York City paid out more nearly $500 million to settle NYPD-related cases); see also City of New York, Office of the Comptroller Claims Report FY 2012, 30, June 4, 2013, https://www.documentcloud.org/documents/1375759-fy-2012-claims-report.html (noting that, in fiscal year 2012, so-called "police action claims," which are claims that result from false arrest or imprisonment, police shootings, excessive use of force, assault, or failure to protect, cost the City $64.4 million, and that in fiscal year 2011, the City paid out $60.2 million in police action claims).

[2] *See, e.g.*, Barry Paddock, et al., *Exclusive: Detective is NYPD's most-sued cop, with 28 lawsuits filed against him since 2006*, N.Y. DAILY NEWS, Feb. 16, 2014, http://www.nydailynews.com/new-york/lawsuits-nypd-double-decade-costing-taxpayers-1b-article-1.1615919#ixzz2ttdX4ZkE  ("The [Daily] News' investigation was centered around the results of a Freedom of Information Law request for a list of lawsuits filed against officers who have been sued 10 or more times over the past decade. The city Law Department provided the names of 51 officers and 463 cases.  A News search found an additional 146 cases against the officers, and four other officers who should have been included in the response — calling into question the city's ability to track these cases.").

money – the City has created a system in which lawsuits are severed from any potential deterrent effect.

**THE CITY FAILS TO TRACK THE RESULTS OF SUPPRESSION HEARINGS AND OTHER PROCEEDINGS WHERE OFFICERS ARE FOUND INCREDIBLE AS A MATTER OF LAW**

53. The City is liable to Plaintiff for its failure to keep track of judicial decisions in suppression hearings where police officers have been found to have fabricated testimony.

54. There are hundreds of published decisions from the past several years in which judges in New York City courtrooms determine that, as a matter of law, police officers have testified incredibly, conducted illegal searches and seizures, and even suborned perjury.

55. Judicial decisions from suppression hearings and trials are particularly reliable indicators of a police officer's professional conduct and credibility because the testimony has been tested in open court, under oath.

56. Yet those in a position of authority – such as NYPD supervisors and prosecutors – do not monitor or report these findings.

57. Furthermore, the City has no procedure to notify individual officers or their supervisors of adverse judicial findings. Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for.

**THE CITY FAILS TO HOLD POLICE OFFICERS PERSONALLY LIABLE, RESULTING IN A COMPLETE LACK OF ACCOUNTABILITY**

58. The City of New York is also liable in this case because, by habitually indemnifying police officers who have acted unconstitutionally, the City isolates such

officers from accountability.[3]   The effect – yet again – is that civil rights lawsuits do not serve a deterrent purpose.   "It is almost axiomatic that the threat of damages has a deterrent effect, *surely particularly so when the individual official faces personal financial liability*." *Carlson v. Green*, 446 U.S. 14, 21, (1980) [emphasis added] (citing *Imbler v. Pachtman*, 424 U.S. 409, 442 (1976)) [footnote omitted].

59.   Furthermore, civil rights lawsuits against NYPD officers have no impact on the officers' careers, regardless of the expense to the City to defend a police misconduct case, and even when the same officers are named in multiple lawsuits, because settlements of civil claims are ordinarily not even noted in an officer's personnel file.[4]

60.   For decades, the City has been on notice that certain officers and precincts are disproportionately responsibility for civil rights lawsuit liability.   Nonetheless, the City has failed to take action to hold officers or precincts accountable, and has failed to investigate to what extent certain officers, units, and precincts are disproportionately responsible.

61.   In 1999, Comptroller Alan Hevesi, in a memo to Police Commissioner Howard Safir, stated that there was "a total disconnect" between the settlements of civil claims – even substantial ones – and NYPD discipline of officers.[5]   Hevesi continued:

> As a result, the NYPD does not learn of potential problem
> officers, fails to take curative action, and not infrequently
> fosters a situation in which an officer will engage in

---

[3] *See* Eric Jaffe, *When Cops Violate Civil Rights, It's City Taxpayers Who Pay*, CITYLAB, Dec. 4, 2014, http://www.citylab.com/crime/2014/12/when-cops-violate-civil-rights-its-city-taxpayers-who-pay/383419/ (reporting that taxpayers almost always satisfy both compensatory and punitive damages awards entered against police officers).

[4] Association of the Bar of the City of New York, Committee on New York City Affairs, "The Failure of Civil Damages Claims to Modify Police Practices, and Recommendations for Change," March 2000, *available at* http://www2.nycbar.org/Publications/reports/print_report.php?rid=32.

[5] *Id*.

> another act of violation, resulting in harm to another person and further damages from the City. More important, study of a large number of cases might well reveal patterns of misconduct against which the NYPD could and should take systematic management action.[6]

62.  The Comptroller recommended that the police department "analyze . . . settled claims, and take steps to review the officers' performance and propensity to commit acts of excessive force."[7]

63.  The City has not heeded Hevesi's advice, and the "total disconnect" remains fully in place today.  The pattern is now all too familiar:  the City pays vast sums of money to resolve cases where New Yorkers' constitutional rights have been violated, while the NYPD does nothing to financially incentivize its officers to change their behavior, and fails to investigate or address the underlying causes of such violations.

## THE CITY FAILS TO DISCIPLINE ITS OFFICERS, THUS ALLOWING UNLAWFUL BEHAVIOR TO GO UNCHECKED

64.  The City is liable because it has created a legal system in which officer misconduct routinely goes unpunished.

65.  The City has purported to attempt to address police officers' abuse of authority, in part through the creation of the CCRB, a police oversight agency with investigative powers.

66.  However, the CCRB has proved vastly inadequate.

67.  First, the CCRB fails in its mission because it often finds complainants "lack credibility" based on the fact that the complainant has also brought a civil rights lawsuit. The result is that the CCRB often fails to substantiate some of the most serious

---

[6] *Id.*

[7] *Id.*

allegations.

68.     Second, when the CCRB has determined that officers have made false statements to the CCRB in their own defense, the CCRB virtually never initiates its own findings against those dishonest officers.  The same is true in situations where the CCRB finds that officers have failed to report their fellow officers' misconduct.

69.     Third, because the CCRB's penalty recommendations are purely advisory and there is no enforcement mechanism, the recommendations have no binding effect on the NYPD or its officers.  Even when the CCRB substantiates complaints, the police department rarely imparts its own discipline on the officer, and often simply drops the complaints.[8]

70.     Fourth, the NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized.  Furthermore, in the rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, a power the commissioner often wields.

71.     Despite the existence of oversight mechanisms, the complaint procedure provides seemingly countless opportunities for City agencies to dismiss or disregard legitimate, credible complaints.

---

[8] *See* Nathan Tempey, *CCRB: Cop Who Shoved Kid Through Hookah Bar Window Used Excessive Force*, gothamist, July 28, 2015, http://gothamist.com/2015/07/28/bronx_hookah_window_ccrb.php (reporting that in 2014, the CCRB substantiated only 327 of nearly 5,000 complaints, and that the NYPD disciplined 10 2 officers in that same period.  Of the officers disciplined, only 22 faced administrative charges); WNYC.org, *Police Punishment: CCRB vs NYPD*, http://project.wnyc.org/ccrb/ (last visited July 23, 2015) (reporting that, in 2012, police officers received no discipline in 104 cases (40.3%) of the substantiated complaints processed (258); in 2013, the NYPD dropped 28.3% of the substantiated complaints without any disciplinary action; in 2014, it dropped 24.5%).

72. Due to the failures of the CCRB, many abuses of authority by police officers go unreported. Officers are thus free to abuse their authority with little or no fear of repercussions.

73. Here, the lack of accountability contributed to the defendant police officers' actions described above in that the officer defendants knew they were insulated from any repercussions for their unlawful actions against Plaintiff.

**THE CITY HAS ENCOURAGED UNCONSTITUTIONAL STOPS THROUGH ITS USE OF ARREST QUOTAS**

74. The City has also been alerted to the regular use of stop, question, and frisk by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such police intrusion actually produce, and despite the humiliation, inconvenience, and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result.

75. Even as the use of stop, question, and frisk has declined precipitously in recent years – in large part due to the federal class action lawsuit *Floyd, et al. v. City of New York, et al.*, 08-CV-1034 (SAS) – the police have continued to use the policing tactic in a severely racially disproportionate manner, and for the improper purpose of meeting "performance goals" (more commonly known as arrest quotas).

76. According to data collected by the New York Civil Liberties Union ("NYCLU"), in 2014, New Yorkers were stopped by the police 46,235 times. Of the people stopped: 38,051 were totally innocent of any crime (82%); 24,777 were Black (55%); 12,662 were Latino (29%); and 5,536 were white (12%).[9]

---

[9] *See* NYCLU, *Stop and Frisk Campaign: About the Issue*, http://www.nyclu.org/content/stop-and-frisk-data (last visited July 22, 2015).

77.     The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people.  For example, the NYCLU reported that more than 85% of summonses for Open Container were given to Black and Latino New Yorkers, whereas white recipients made up merely 4%.[10]  The grossly disproportionate issuance of summonses to New Yorkers of color led one Kings County judge to note that he could not recall ever having arraigned a white defendant on an open container charge.[11]

78.     Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals," resulting in the violation of innocent New Yorker's civil rights.[12]

79.     The City's inability to prevent its officers from abusing the stop and frisk policy is emblematic of the City's continuing failures to exercise adequate control over the NYPD, and to prevent police officers from abusing their authority.  Such failures have led to further abuse of authority by police officers, including the incident underlying Plaintiff's Complaint.

80.     All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal.  As the Honorable Jack Weinstein, United States District Court Judge for the Eastern District of New York, has written:

---

[10] *See* NYCLU, *Testimony Before City Council Public Safety & Courts and Legal Services Committees On Summons Court Operations and Impact*, http://www.nyclu.org/content/testimony-city-council-public-safety-courts-and-legal-services-committees-summons-court-oper.

[11] *People v. Figueroa*, 36 Misc.3d 605, 608 (Kings Co. 2012).

[12] *See* Jim Hoffer, *NYPD Officer Claims Pressure to Make Arrests*, WABC News ( (Mar. 2, 2010, 10:37 PM), http://7online.com/archive/7305356/ and Jim Hoffer, *Kelly Responds to Our NYPD Quotas,* WABC News (May 25, 2010, 3:31 PM), http://7online.com/archive/7461355/.

> Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated, widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration—through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department—there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged.

*Colon v. City of New York*, No. 09-CV-8, 2009 WL 4263362, at \*2 (E.D.N.Y. Nov. 25, 2009).

81.    The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.  Despite such notice, the City has failed to take corrective action.  This failure and these policies caused the officers in the present case to violate Plaintiff's civil rights, without fear of reprisal.

82.    Plaintiff has been damaged as a result of the City's deliberate indifference.

    WHEREFORE, plaintiff demands judgment against the defendants, jointly and severally, as follows:

    A.    In favor of plaintiff in an amount to be determined by a jury for each of plaintiff's causes of action;

    B.    Awarding plaintiff punitive damages in an amount to be determined by a jury;

    C.    Awarding plaintiff reasonable attorneys' fees, costs and disbursements of this action; and

    D.    Granting such other and further relief as this Court deems just and proper.

17

## **JURY DEMAND**

Plaintiff demands a trial by jury.

| | |
|---|---|
| Dated: July 12, 2016<br><br>To:<br>City of New York<br>Detective Niurca Quinones, #. 3310<br>Office of Corporation Counsel<br>100 Church St.<br>New York, NY 10007<br><br>Sergeant Steven Smolarsky<br>Brooklyn Special Victims Unit<br>653 Grand Avenue<br>Brooklyn, NY 11238 | Respectfully,<br><br>Nicole Bellina<br>Stoll, Glickman & Bellina, LLP<br>Attorneys for Plaintiff<br>475 Atlantic Ave. Fl.3<br>Brooklyn, NY 11217<br>718 852 3710 |